**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| JOEL COHN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TARGET CORPORATION, a Minnesota corporation,<br><br>Defendant. | Civil Action No.__________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Joel Cohn ("Plaintiff" or "Mr. Cohn"), by and through his attorneys, brings this Class Action Complaint against Target Corporation ("Target" or "Defendant"), individually and on behalf of all others similarly situated. Following the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge, Mr. Cohn makes the following allegations:

## NATURE OF THE ACTION

1. Mr. Cohn brings this class action on behalf of himself and all persons who purchased any of the following Target "Up & Up" brand dietary supplements: Gingko Biloba, St. John's Wort, and Valerian Root (the "Affected Up & Up Dietary Supplements" or the "Products"), from February 13, 2009 to the present (the "National Class"). Mr. Cohn also brings this action on behalf of a subclass of New Jersey citizens who purchased the Affected Up & Up Dietary Supplements from February 13, 2009 to the present (the "New Jersey Class" and, collectively with the National Class, the "Class").

2. Each of the Affected Up & Up Dietary Supplements that Target sells bears a label advertising that the Product contains certain ingredients. In addition to the main herbal ingredient, the label discloses, or is supposed to disclose, other substances in the caplet that the purchasers would be ingesting. Consumers reasonably understand the labels to mean that the Products do not contain adulterants or undisclosed substances, and that the label accurately discloses the substances they are ingesting.

3. These statements of identity, quantity, and purity are central to Defendant's packaging and labeling of the Products, which causes consumers to purchase and ingest the Products.

4. Testing conducted by the New York State Attorney General's office, however, establishes that Defendant's labeling is deceptive and misleading because the Products do not contain the ingredients represented on the labels, and contain adulterants or undisclosed substances. Testing conducted by Plaintiff's counsel further confirms that the product Mr. Cohn purchased from Target did not contain the ingredient represented on the product's label.

5. If Mr. Cohn and the Class knew that the label statements were deceptive and misleading and that the Products did not contain the ingredients as represented on the labels, and/or that the Products contained adulterants or undisclosed substances, they would not have purchased the Products.

6. Mr. Cohn and the Class were damaged, in an amount to be determined at trial, because they purchased Defendant's Products and received Products that did not contain the ingredients as represented on the labels, and/or received Products that contained adulterants or undisclosed substances, which were not what they had paid for.

7. Defendant's wrongful conduct deceived and misled Mr. Cohn and the Class into purchasing Defendant's Products by representing that the Products contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances, violating the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68-.70, the Minnesota Unlawful Trade Practices Act, Minn. Stat. § 325D.09-.16, the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-.48, and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et. seq*.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because: (1) there are at least 100 Class Members in the proposed Class; (2) the combined claims of proposed Class Members exceed $5,000,000 exclusive of interest and costs, and; (3) at least one Class Member is a citizen of a state other than Defendant's state of citizenship.

9. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Target because Target resides in Minnesota, purposefully avails itself of and has sufficient minimum contacts with the Minnesota consumer market such that adjudicating this dispute here would be fair to Target and would not offend traditional notions of fair play and substantial justice.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d), because Target resides in this District—which encompasses Defendant's principal place of business—conducts substantial business in this District, has sufficient minimum contacts with this District, and purposely avails itself of the markets in this District through the marketing and

sale of its products in this District, and because a substantial part of the events giving rise to the claims asserted occurred in this District.

## THE PARTIES

12. Mr. Cohn is a citizen of New Jersey. In December 2014, he purchased a bottle of Target Up & Up Gingko Biloba from a Target store in or near Union, New Jersey. Mr. Cohn decided to purchase the Target Up & Up Gingko Biloba after reading the product's label and seeing that the product purported to contain gingko biloba. If Mr. Cohn had known that the product did not contain gingko biloba as represented on the label, and/or contained adulterants or undisclosed substances, he would not have purchased it.

13. Defendant Target is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Target operates more than 1,800 retail stores throughout the United States and reported over $71.2 billion in net sales for its fiscal year ending February 1, 2014, with a gross profit of $21.2 billion. Target has trademarked the name "Up & Up," and distributes and sells the Affected Up & Up Dietary Supplements as their own store brand of dietary supplements.

## FACTUAL ALLEGATIONS

### The Lucrative Dietary Supplement Market Affects Millions of Consumers

14. In enacting the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), Pub. L. 103-417, 108 Stat. 4325 (codified in scattered sections of 21 U.S.C.), Congress found that "almost 50 percent of 260,000,000 Americans regularly consume dietary supplements of vitamins, minerals, or herbs," and that "total annual sales of such products… reach[ed] at least $4,000,000,000."[1]

---

[1] DSHEA §§ 2(9) & (12)(C).

15. By 2002, the Nutrition Business Journal estimated that the market for dietary supplements was worth nearly $18 billion.[2] By 2012, according to the Nutrition Business Journal, the market was worth over $32 billion.[3]

16. An October 2014 survey conducted by the Council for Responsible Nutrition, which characterizes itself as the "leading trade association representing dietary supplement and functional food manufacturers and ingredient suppliers,"[4] boasted that "68 percent of U.S. adults report[ed] taking dietary supplements, including over 50 percent who report[ed] being regular users."[5]

17. Mr. Cohn is one of the millions of Americans who have purchased dietary supplements. Mr. Cohn purchased Target Up & Up Gingko Biloba believing that it contained gingko biloba as represented on the label, and that it did not contain adulterants or undisclosed substances. Target deceived and misled Mr. Cohn and other Class Members.

---

[2] *See* Charles A. Morris & Jerry Avorn, *Internet Marketing of Herbal Products*, 290 J. AM. MED. ASSOC. 1505, 1505 n.4 (2003).

[3] *See* Council for Responsible Nutrition, *Fact Sheet, Dietary Supplements: Safe, Regulated and Beneficial* (2014), *available at*: http://www.crnusa.org/pdfs/DSSafeRegulatedBeneficial_rev0613.pdf.

[4] About CRN, Council for Responsible Nutrition, http://www.crnusa.org/who_about.html (last accessed Feb. 17, 2015).

[5] Council for Responsible Nutrition, *New Survey Reveals High Percentage of U.S. Population Take Dietary Supplements—and with High Confidence* (Oct. 30, 2014), *available at*: http://www.crnusa.org/CRNPR14-CRNCCSurvey103014.html.

**Federal Law Requires Manufacturers to Ensure the Identity, Quantity, and Purity of Dietary Supplements**

18. Under DSHEA, dietary supplements are defined as, among other things, a "product… intended to supplement the diet that bears or contains… an herb or other botanical."[6]

19. Dietary supplements are not subject to the strict United States Food and Drug Administration ("FDA") regulations that apply to drugs and medications. They are, however, subject to certain provisions of DSHEA and the regulations promulgated thereunder by the FDA.

20. 21 U.S.C. § 343(s) provides that a food "shall be deemed to be misbranded" if it is a dietary supplement and fails to list "the name of each ingredient" in the dietary supplement, the "quantity of each such ingredient," or "the label or labeling of the supplement fails to identify any part of the plant from which the ingredient is derived," or, if the supplement is either covered by the specifications of an official compendium, is represented as conforming to the specifications of an official compendium, and fails to so conform, or, for supplements that aren't covered by an official compendium, if it "fails to have the identity and strength that the supplement is represented to have."

21. 21 U.S.C. § 342(g)(1) provides that a food shall be deemed to be adulterated "[i]f it is a dietary supplement and it has been prepared [or] packed... under conditions that do not meet current good manufacturing practice regulations...."

22. The current good manufacturing practice regulations promulgated by the FDA under DSHEA[7] require dietary supplement manufacturers, packagers, and labelers

[6] 21 U.S.C. § 321(ff)(1)(C). For purposes of the Federal Food, Drug, and Cosmetic Act, "a dietary supplement shall be deemed to be a food…." *Id.* § 321(ff).

[7] *See* Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752 (June 25, 2007).

("Manufacturer")[8] to "implement a system of production and process controls that covers all stages of manufacturing, packaging, labeling, and holding of the dietary supplement to ensure the quality of the dietary supplement…."[9]

23. Manufacturers must establish precise "component specifications… to ensure… the purity, strength and composition of dietary supplements manufactured using the components…."[10]

24. Manufacturers are required to extensively test each component used in the manufacture of dietary supplements. This testing is conducted on each incoming shipment of components prior to their use in the manufacture of dietary supplements,[11] and again on each finished batch.[12]

25. Each step of the manufacturing process must be performed according to a master manufacturing record.[13] Each time a batch of dietary supplements is produced, the manufacturer must create a batch production record that identifies, among other things, any deviations from the master manufacturing record.[14]

---

[8] 21 C.F.R. § 111.3.

[9] *Id.* § 111.55; *see also id.* § 111.65 (requiring manufacturers to implement quality control systems).

[10] *Id.* § 111.70(b)(2).

[11] *Id.* § 111.75(a).

[12] *Id.* § 111.75(c).

[13] *Id.* §§ 111.205 & 111.210 (establishing requirements for the master manufacturing record).

[14] *Id.* §§ 111.255 & 111.260.

26. Manufacturers must also retain representative samples of each unique lot of components, packaging, and labels, as well as representative samples of each lot of dietary supplements shipped.[15]

**Target Deceptively and Misleadingly Claims That the Products Contain Ingredients as Represented on the Labels**

27. Target makes representations on the labels of each of the Affected Up & Up Dietary Supplements regarding the ingredients in the Products. Specifically:

(a) Target Up & Up "Gingko Biloba" purports to contain 120 mg of "Ginkgo (Ginkgo Biloba) (Leaf) Standardized Extract (24% Flavone Glycosides, 6% Terpene Lactones)" per serving, and to also contain "Dicalcium Phosphate, Microcrystalline Cellulose, Croscarmellose Sodium, Stearic, Magnesium Stearate, Hypromellose, Hydroxypropylcellulose, [and] Polyethylene Glycol";




(b) Target Up & Up "St. John's Wort" purports to contain 300 mg of "St. John's Wort (Hypericum perforatum) (aerial parts) Standardized extract

---

[15] *Id.* §§ 111.80 & 111.83.

(0.3% hypericin)" per serving, and to also contain "Dicalcium Phosphate, Maltodextrin, Microcrystalline Cellulose, Croscarmellose Sodium, Tricalcium Phosphate, Stearic Acid, Magnesium Stearate, Hypromellose, Hydroxypropyl Cellulose, [and] Polyethylene Glycol";




(c) Target Up & Up "Valerian Root" purports to contain 90 mg of "Valerian (Valeriana Officinalis) (Root) (Standardized to a Minimum of 0.8% Valerenic Acids)" per serving, and to also contain "Microcrystalline Cellulose, Gelatin, Maltodextrin, Magnesium Stearate, [and] Silicon Dioxide."



28. A reasonable consumer would expect, as Mr. Cohn did, that the label statements regarding the identity, quantity, and purity of the Affected Up & Up Dietary Supplements would be truthful and not deceptive or misleading.

**Testing Establishes That Defendant's Dietary Supplements Do Not Contain the Ingredients as Represented on the Labels**

29. By a Cease and Desist Notification dated February 2, 2015, the New York State Attorney General, Eric T. Schneiderman, informed Target that testing (the "Tests") revealed that the Products did not contain the ingredients as represented on their labels.[16] The Tests further revealed the presence of adulterants and undisclosed substances that were not listed on the labels, and concluded that the Products "were either unrecognizable or a substance other than what they claimed to be, and therefore fairly constitute contaminated or substituted products." The New York State Attorney General ordered Target to immediately cease selling the affected Products.

30. The Tests were performed on six of Defendant's Up & Up brand dietary supplements, including the affected Products.

31. Each of the Products was tested fifteen times. To conducts the Tests, investigators purchased the Affected Up & Up Dietary Supplements at three Target locations throughout New York State. Each individual sample was then tested five times using DNA barcoding technology.

32. DNA barcoding technology "uses state-of-the-art biotechnology to help identify plant material based on short, standardized gene sequences, in a rapid, accurate and cost-

[16] *See generally* Letter from Eric. T. Schneiderman, N.Y. Attorney General to Brian C. Cornell, CEO, Target Corporation (Feb. 2, 2015), at 1, *available at*: http://www.documentcloud.org/documents/1532311-supplements.html#document/p5.

effective manner."[17] The process has been lauded as a "simple and efficient method for accurate species identification of Natural Health products."[18]

33. The Tests concluded:

(a) Target Up & Up "Gingko Biloba" contained orzya [rice], allium [garlic], and mung/French bean, but "no gingko biloba DNA was identified";

(b) Target Up & Up "St. John's Wort" contained oryza, allium, and dracaena [the genus encompassing the common houseplant], but "[n]o St. John's Wort DNA was identified";

(c) Target Up & Up "Valerian Root" contained oryza, allium, wild carrot, saw palmetto, phasolus/beans, phasolus fabacaeae, and pea family DNA, but "[n]o Valerian root DNA was identified."

34. Plaintiff's counsel subjected the actual gingko biloba that Mr. Cohn purchased from Target to DNA testing. The tests conducted on Mr. Cohn's gingko biloba failed to identify the presence of gingko biloba DNA. These results are consistent with the New York State Attorney General's tests.

---

[17] Steven G. Newmaster et al., *DNA Barcoding Detects Contamination and Substitution in North American Herbal Products*, 11 BMC MEDICINE 222 (2013), *available at*: http://biomedcentral.com/1741-7015/11/222. To perform DNA barcoding, researchers extract, purify, amplify, and sequence a sample of material containing DNA. To identify plant species, researchers typically look either at a region of the chloroplast gene called the RuBisCo large subunit (*rbcL*), or a region of ribosomal RNA called the internal transcribed spacer (*ITS*). These short, highly variable regions, provide researchers with a unique DNA "barcode" that can be catalogued in a database and used to identify individual plant species. *Id.*

[18] *See, e.g.*, Lauren J. Wallace et al., *DNA Barcodes for Everyday Life: Routine Authentication of Natural Health Products*, 49 FOOD RESEARCH INT'L 446, 451 (2012).

**Independent Scientists Have Used DNA Barcoding to Repeatedly Demonstrate That Manufacturers Make Deceptive and Misleading Claims About the Content of Dietary Supplements**

35. The Tests should have come as no surprise to Target since several peer-reviewed scientific studies have used DNA barcoding to identify rampant deceptive and misleading practices within the dietary supplement market.

36. In 2013, researchers at the Centre for Biodiversity Genomics at the University of Guelph published a study in which they used DNA barcoding to conclude that "[w]hat is listed on the label of herbal products is not always what is found within the product."[19]

37. Using DNA barcoding, the Guelph researchers concluded that the majority (52%) of herbal products tested did not contain the ingredients they purported to contain.[20] Most (59%) of the herbal products tested contained species of plants that were not listed on the product labels. Some (33%) of the herbal products tested also contained contaminants and/or fillers that were not listed on the product labels.

38. In 2012, a study published in Food Research International used DNA barcoding to determine whether dietary supplements purporting to contain ginseng actually contained the ingredient as represented.[21]

---

[19] Steven G. Newmaster et al., *DNA Barcoding Detects Contamination and Substitution in North American Herbal Products*, 11 BMC MEDICINE 222 (2013), *available at*: http://biomedcentral.com/1741-7015/11/222.

[20] The researchers found that "[h]igh quality DNA barcodes were obtainable for both *rbcL* and *ITS2* regions for 100% of the 100 vouchered herbal species." *Id.* The researchers further concluded that the fact that the herbal products were processed was "not an impediment to recovering barcodes." *Id.*

[21] *See* Lauren J. Wallace et al., *DNA Barcodes for Everyday Life: Routine Authentication of Natural Health Products*, 49 FOOD RESEARCH INT'L 446 (2012).

39. The study determined that half of the tested supplements purporting to be Korean ginseng (*Panax ginseng*) were actually American ginseng (*Panax quinquefolius*), a different product.

40. The authors of the study concluded that economic motivations were likely responsible in part for the deceptive and misleading labeling identified.

41. Accordingly, in addition to the applicable federal regulations, Target knew, or should have known, of the need for vigilance in the manufacture, packaging, labeling, and distribution of dietary supplements.

**Target Failed to Disclose Material Facts**

42. Target failed to disclose on its labels or otherwise that the Products do not contain the ingredients represented on the Products' labels or that the Products contain adulterants or undisclosed substances.

43. The actual contents of the Products are important to consumers. Target's failure to disclose that the Products do not contain the ingredients as represented on the Products' labels and that the Products contain adulterants or undisclosed substances affected Mr. Cohn's and the Class Members' purchasing decisions in that they would not have purchased the Products had Target disclosed the true facts concerning their actual ingredients and composition.

**Public Interest and Benefit**

44. Mr. Cohn brings this action on behalf of himself and all others similarly situated for the relief requested and to promote the public interest. Target's deceptive and fraudulent practices have undermined the public's ability to make informed purchasing decisions with regards to the Products. By seeking the relief requested, including injunctive relief enjoining Target's deceptive and fraudulent practices, Mr. Cohn seeks to promote the public's right to truthful and non-deceptive information. Target's misrepresentations and omissions of material

facts appeared on the labels of each of the Products, which were directed to Mr. Cohn and the public at large. The Products bearing these labels containing material misrepresentations and omissions were distributed throughout the United States, including in Minnesota. By seeking injunctive relief and damages, this action will serve the public interest by, among other things, enforcing the consumer laws that were enacted to protect consumers and the public at large.

## CLASS ALLEGATIONS

45. Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of himself and the National Class, defined as:

> All persons who purchased the Affected Up & Up Dietary Supplements from February 13, 2009 to the present (the "National Class").

46. Plaintiff also brings this action on behalf of a subclass of New Jersey citizens, defined as:

> All citizens of New Jersey who purchased in New Jersey the Affected Up & Up Dietary Supplements from February 13, 2009 to the present (the "New Jersey Class" and, collectively with the National Class, the "Class").

47. Excluded from the Class are Target and its subsidiaries and affiliates; governmental entities and employees; the judges to whom this case is assigned and any immediate family or staff members thereof; and all persons who timely elect to be excluded from the Class.

48. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

49. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is

impractical. Defendant's national packaging and labeling decisions emanated from Minnesota and targeted consumers across the country, including in Minnesota and New Jersey. Although there are likely thousands if not millions of individuals who purchased the Affected Up & Up Dietary Supplements, the number of Class members are unknown to Plaintiff at this time but will be determined through discovery. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, including U.S. Mail, electronic mail, Internet postings, and/or published notice.

50. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves questions of law and fact common to Plaintiff and all members of the Class, which predominate over any questions affecting individual Class Members. All Class Members were exposed to the deceptive and misleading statements that the Products contained the ingredients as represented on the labels, and understood the label statements to mean that the Products did not contain adulterants or undisclosed substances, because the statements were on the label of each of the Products sold and Defendant failed to disclose that the Products did not contain ingredients as represented on the labels and/or contained adulterants and undisclosed substances. Common questions of law and fact—the resolution of which will resolve the issues for all class members—include:

(a) Whether Defendant's statements that the Products contained the ingredients as represented on the labels, and Defendant's omissions of material fact, were deceptive or misleading;

(b) Whether Defendant's practices violated applicable law;

(c) Whether Plaintiff and Class Members sustained damages resulting from Defendant's conduct and, if so, the proper measure of damages, restitution, equitable, or other relief;

(d) Whether Defendant breached its warranties to Plaintiff and the Class;

(e) Whether Defendant was unjustly enriched by its conduct.

51. **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of absent Class Members because, among other things, Plaintiff and all Class Members each sustained damages arising from Defendant's uniform and wrongful conduct, as described above, and were each exposed to Defendant's deceptive and misleading omissions and statements on the label of each of the Products sold. Plaintiff is a member of the Class he seeks to represent. Furthermore, there are no defenses available to Target that are unique to Plaintiff.

52. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiff understands and is willing to undertake the responsibilities of acting in a representative capacity on behalf of the proposed Class. Plaintiff is an adequate representative of Class Members because he has no interests adverse to, or which directly conflict with, the interests of other Class Members and Plaintiff will fairly and adequately protect the interests of the Class.

53. Plaintiff has engaged the services of counsel who are experienced in complex class litigation, who will adequately prosecute this action, and who will assert and protect the rights of and otherwise represent Plaintiff and the absent Class Members.

54. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** This action is brought under Rule 23(b)(2) because Defendant has acted or refused to act on

grounds generally applicable to all members of the Class, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to Class Members.

55. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and Plaintiff knows of no unusual difficulty that will be encountered in the management of this litigation that would preclude maintenance as a class action. The damages or other financial detriment suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Target, so it would be impractical for Class Members to seek individual redress for Defendant's wrongful conduct. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system. Accordingly, judicial determination of the common legal and factual issues essential to this case would be far more efficient and economical as a class action than piecemeal individual determinations.

## COUNT I

### Violation of the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68-.70 (On behalf of the National Class)

56. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

57. Plaintiff brings this claim individually and on behalf of the National Class.

58. The Affected Up & Up Dietary Supplements are "merchandise" as defined in Minn. Stat. § 325F.68, subd.2.

59. Plaintiff, Class Members, and Defendant are each "persons" as defined in Minn. Stat. § 325F.68, subd.3.

60. Minn. Stat. § 325F.69, subd.1 makes unlawful the "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby…."

61. Minn. Stat. § 8.31, subd.3a provides that "any person injured by a violation of any of the laws referred to in subdivision 1 [including the Prevention of Consumer Fraud Act] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

62. Target misrepresented the Affected Up & Up Dietary Supplements as containing the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances.

63. Target failed to disclose that the Affected Up & Up Dietary Supplements did not contain the ingredients as represented on the labels and failed to disclose that the Products contained adulterants or substances not listed on the Products' labeling.

64. Defendant's material omissions and misrepresentations that the Affected Up & Up Dietary Supplements contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances, constitute an unlawful practice, fraud, false promise, misrepresentation, misleading statement and/or deceptive practice in violation of the Minnesota Prevention of Consumer Fraud Act.

65. Defendant's material misrepresentations and omissions were made with the intent that Plaintiff and the Class would rely on them and that the material misrepresentations and omissions would influence Plaintiff and the Class to purchase the Products.

66. Target had a duty to accurately and truthfully disclose the actual contents of the Products in light of the above requirements governing the manufacture, packaging, and labeling of dietary supplements, the representations made on the Products' labeling and the resulting need to disclose the truth about the contents of the Products because of the false and misleading representations made on the Product's labeling, and the fact that Target had special knowledge in that Target knew or should have known the actual ingredients in the Products, knowledge which was in Target's exclusive possession and was not known to Plaintiff or Class Members.

67. Plaintiff and the Class were misled and deceived by Defendant's material misrepresentations and omissions and were damaged because:

(a) They would not have purchased the Affected Up & Up Dietary Supplements had they known that the Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

(b) The value they received from the Affected Up & Up Dietary Supplements was less than the price they paid to purchase the Products due to the misrepresentations and omissions in the Products' labeling, as described above; and/or

(c) The Affected Up & Up Dietary Supplements were worthless and had no value due to Defendant's misrepresentations, omissions, and mislabeling, as described above.

## COUNT II

**Violation of the Unlawful Trade Practices Act, Minn. Stat. § 325D.09-.16**
**(On behalf of the National Class)**

68. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

69. Plaintiff brings this claim individually and on behalf of the National Class.

70. Minn. Stat. § 325D.13 provides that "[n]o person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

71. Minn. Stat. § 325D.15 provides in part that "[a]ny person damaged or who is threatened with loss, damage, or injury by reason of a violation of sections 325D.09 to 325D.16 shall be entitled to sue for and have injunctive relief in any court of competent jurisdiction against any damage or threatened loss or injury by reason of a violation… and for the amount of the actual damages, if any."

72. Minn. Stat. § 8.31, subd. 3a provides that "any person injured by a violation of any of the laws referred to in subdivision 1 [including the Unlawful Trade Practices Act] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court."

73. Defendant, in connection with the sale of merchandise—the Products—knew or should have known that the Products did not contain the ingredients represented on their labels and knew or should have known that the Products contained adulterants and/or undisclosed substances. Defendant misrepresented the ingredients of the Products by representing that the Products contained the listed ingredients and by failing to disclose that the Products did not

contain the ingredients listed on the labeling and contained adulterants and/or other unlisted substances.

74. Plaintiff and the Class were misled and deceived by Defendant's material misrepresentations and omissions and were damaged and injured as a result of Defendant's conduct because:

(a) They would not have purchased the Affected Up & Up Dietary Supplements had they known that the Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

(b) The value they received from the Affected Up & Up Dietary Supplements was less than the price they paid to purchase the Products due to the misrepresentations and omissions in the Products' labeling, as described above; and/or

(c) The Affected Up & Up Dietary Supplements were worthless and had no value due to Defendant's misrepresentations, omissions, and mislabeling, as described above.

## COUNT III

**Violation of the Minnesota Uniform Deceptive Trade Practices Act,**
**Minn. Stat. § 325D.43-48**
**(On behalf of the National Class)**

75. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

76. Plaintiff brings this claim individually and on behalf of the National Class.

77. Minn. Stat. § 325D.44 prohibits certain enumerated acts and omissions as deceptive trade practices.

78. Minn. Stat. §325D.45 provides that "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable." The statute further provides that "[c]osts shall be allowed to the prevailing party unless the court otherwise directs."

79. Defendant sold the Affected Up & Up Dietary Supplements in the course of its business.

80. By materially misrepresenting that the Affected Up & Up Dietary Supplements contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances, and by failing to disclose the material facts that the Products did not contain the ingredients represented on the labels and/or contained adulterants or undisclosed substances, Defendant caused a likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of the Products; represented that the Products had sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they did not have; represented that the Products were of a particular standard, quality, or grade when they were not; advertised the Products with intent not to sell them as advertised; and engaged in conduct that created a likelihood of confusion or of misunderstanding.

81. Defendant's material omissions and misrepresentations that the Affected Up & Up Dietary Supplements contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances, constitutes an unlawful deceptive trade practice in violation of the Minnesota Uniform Deceptive Trade Practices Act.

82. Defendant's material misrepresentations and omissions were made with the intent that Plaintiff and the Class would rely on them and that the material misrepresentations and omissions would influence Plaintiff and the National Class to purchase the Products.

83. Plaintiff and the National Class were misled and deceived by Defendant's material misrepresentations and omissions and were damaged because:

(a) They would not have purchased the Affected Up & Up Dietary Supplements had they known that the Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

(b) The value they received from the Affected Up & Up Dietary Supplements was less than the price they paid to purchase the Products due to Defendant's misrepresentations, omissions and mislabeling, as described above; and/or

(c) The Affected Up & Up Dietary Supplements were worthless and had no value due to Defendant's misrepresentations, omissions and mislabeling, as described above.

**<u>COUNT IV</u>**

**Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et. seq.***
**(On behalf of the New Jersey Class)**

84. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

85. Plaintiff brings this claim individually and on behalf of the New Jersey Class.

86. Target misrepresented the Affected Up & Up Dietary Supplements as containing the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances and by failing to disclose the material facts that the Products did not contain the ingredients represented on the labels and/or contained adulterants or other undisclosed substances.

87. Defendant's material and intentional omissions and its misrepresentations that the Affected Up & Up Dietary Supplements contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances, constitute an unconscionable commercial practice, deception, fraud, false promise, intentional omission and/or misrepresentation as to the nature of the goods, in violation of New Jersey's Consumer Fraud Act.

88. Plaintiff and members of the New Jersey Class suffered an ascertainable loss caused by Defendant's material omissions and misrepresentations because:

(a) They would not have purchased the Affected Up & Up Dietary Supplements had they known that the Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

(b) The value they received from the Affected Up & Up Dietary Supplements was less than the price they paid to purchase the Products due to Defendant's omissions, misrepresentations and mislabeling, as described above; and/or

(c) The Affected Up & Up Dietary Supplements were worthless and had no value due to Defendant's omissions, misrepresentations and mislabeling, as described above.

**COUNT V**

**Breach of Warranty**
**(On behalf of the New Jersey Class)**

89. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

90. Plaintiff brings this claim individually and on behalf of the New Jersey Class.

91. Plaintiff, and each member of the New Jersey Class, formed a contract with Defendant at the time Plaintiff and the other members of the New Jersey Class purchased the Affected Up & Up Dietary Supplements. The terms of that contract include the promises and affirmations of fact made by Defendant on the Products' packaging, as described above. This packaging constitutes express warranties and became part of the basis of the bargain, and is part of the standardized contract between Plaintiff and the members of the New Jersey Class and Defendant.

92. Through its packaging, Defendant creates express warranties that the Products contain the ingredients as represented on the labels, and/or that the Products do not contain adulterants or undisclosed substances.

93. All conditions precedent to Defendant's liability under this contract were performed by Plaintiff and members of the New Jersey Class when they purchased the Products and used them as directed.

94. Despite the express warranties that the Affected Up & Up Dietary Supplements contain the ingredients as represented on the labels, and/or that the Products do not contain adulterants or undisclosed substances, the Affected Up & Up Dietary Supplements do not contain the ingredients as represented on the labels, and/or contain adulterants or undisclosed substances.

95. Defendant breached express warranties about the Products and their efficacy because the products do not conform to Defendant's affirmations and promises that they contain the ingredients as represented on the labels, and/or that the Products do not contain adulterants or undisclosed substances, as described above.

96. As a result of Defendant's breach of express warranty, Plaintiff and the New Jersey Class were harmed in the amount of the purchase price of the Affected Up & Up Dietary Supplements.

**COUNT VI**

**Breach of Implied Warranty**
**(On behalf of the New Jersey Class)**

97. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

98. Plaintiff brings this claim individually and on behalf of the New Jersey Class.

99. Plaintiff and the members of the New Jersey Class purchased Defendant's Products, which were packaged and labeled as containing the ingredients as represented on the labels, and as not containing adulterants or undisclosed substances. Pursuant to those sales, and by Defendant's packaging, Defendant impliedly warranted that its Products contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances. Plaintiff and the members of the New Jersey Class bought the Products from Defendant relying on Defendant's skill and judgment in furnishing suitable goods, as well as its representations that the Products contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances. However, Defendant's Products do not contain the ingredients as represented on the labels, and/or contain adulterants or undisclosed substances.

100. Defendant breached the warranty implied at the time of sale in that Plaintiff and the members of the New Jersey Class did not receive Products that contained the ingredients as represented on the labels, and/or Products that did not contain adulterants or undisclosed substances, and thus, the goods were not fit for the purpose as packaged and sold.

101. As a result of this breach of warranty by Defendant, Plaintiff and the members of the New Jersey Class have suffered damages in an amount to be determined by this Court and/or a jury in that, among other things, they purchased and paid for Products that did not conform to what was promised on the package, and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than was warranted, or they purchased Products that they would not have purchased and used had they known the true facts about them.

**COUNT VII**

**Unjust Enrichment**
**(On behalf of the National Class and the New Jersey Class)**

102. Plaintiff incorporates by reference the allegations above as though fully set forth herein.

103. Plaintiff brings this claim individually and on behalf of the National Class and the New Jersey Class.

104. Plaintiff and the Class Members conferred an economic benefit directly on Target because they paid money to Target to purchase the Products. The economic benefits, including the money Plaintiff and the Class Members paid to Target and the profits Target derived, is a direct and proximate result of Target's unlawful practices as described above.

105. Target appreciates and has knowledge of the benefits that Plaintiff and the Class Members directly conferred on it.

106. The economic benefits that Target derived rightfully belong to Plaintiff and members of the Class.

107. Target has been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Products. Under principles of equity and good conscience, Target's

retention of such revenues under these circumstances is unjust and inequitable because Target deceptively and misleadingly claimed that the Products contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances and failed to disclose the material facts that the Products did not contain the ingredients as represented on the labels and/or contained adulterants or undisclosed substances. Defendant's deceptive and misleading omissions and statements injured Plaintiff and Class Members because they would not have purchased the Products if the true facts concerning their composition and actual ingredients had been known.

108. It would be inequitable under established unjust enrichment principles in the District of Columbia and each of the 50 states to permit Target to retain the economic benefits, including the money that Plaintiff and members of the Class paid to Target and the profit Target derived, from Target's unlawful conduct as described above.

109. Target should be compelled to disgorge into a common fund for the benefit of Plaintiff and the Class all unlawful or inequitable proceeds that it received.

110. A constructive fund should be imposed upon all unlawful or inequitable sums that Target received that are traceable to Plaintiff and the Class.

111. Plaintiff and the Class have no adequate remedy at law.

112. Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and the Class Members is unjust and inequitable under the unjust enrichment laws and principles in the District of Columbia and each of the 50 states, Target must pay restitution to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment against Defendant as follows:

A. An order certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class Members;

B. An order declaring that Defendant's acts and practices violate the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68-70, the Unlawful Trade Practices Act, Minn. Stat. §§ 325D.09-.16, the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43-48, the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, breach express and implied warranties, and constitute unjust enrichment;

C. For damages pursuant to Minnesota and New Jersey law in an amount to be determined at trial, including interest;

D. For restitution for monies wrongfully obtained and/or disgorgement of ill-gotten revenues and/or profits;

E. A permanent injunction enjoining Defendant from continuing to harm Plaintiff and the Class Members by selling the Affected Up & Up Dietary Supplements with the deceptive and misleading label statements and omissions, and violating Minnesota and New Jersey law, and requiring Defendant to institute an appropriate quality-control program;

F. An order requiring Defendant to adopt and enforce a policy that requires appropriate removal of the deceptive and misleading label statements, which complies with Minnesota and New Jersey law;

G. Reasonable attorneys' fees and the costs of the suit; and

H. Such other relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial of his claims by jury to the extent authorized by law.

Dated: February 18, 2015

Respectfully submitted,

s/ *Vincent J. Esades*

Vincent J. Esades (249361)
Renae D. Steiner (222392)
David Woodward (018844X)
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Tel.: (612) 338-4605
Fax: (612) 338-4692
vesades@heinsmills.com
rsteiner@heinsmills.com
dwoodward@heinsmills.com

Andrei V. Rado (*pro hac vice* forthcoming)
Henry J. Kelston (*pro hac vice* forthcoming)
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Tel.: (212) 594-5300
Fax: (212) 868-1229
arado@milberg.com
hkelston@milberg.com

Bruce D. Greenberg (*pro hac vice* forthcoming)
LITE DEPALMA GREENBERG, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102
Tel.: (973) 623-3000
Fax: (973) 877-3845
bgreenberg@litedepalma.com

*Counsel for Plaintiff*